# CORPORATION COURT OF THE CITY OF LYNCHBURG

Meriden Brittannia Co.

v.

F. D. Johnson & Sons et al.

December 1893

BY JUDGE J. SINGLETON DIGGS

This is a suit in equity, brought under § 2460 of the Code of 1887, by the Meriden Brittannia Company, a creditor of F. D. Johnson & Sons, seeking to set aside a general deed of assignment made by said firm, conveying all the partnership assets to A. R. Long, trustee, in trust to pay the partnership debts. Sundry other creditors have come in by petition as parties plaintiff, but for convenience the said Company will be alluded to as the plaintiff.

The deed in question was executed and recorded April 21, 1893, and the suit was brought to the May Rules. The deed makes a preference among the creditors, dividing them into five classes, placing the Meriden Brittannia Company, as to $4,712.54 of its claim, in the third class, and the balance of its claim, not specified in the deed, but proven to be over $10,000, in the fifth and last class, as coming under the description in that class of "all creditors of the said F. D. Johnson & Sons ratably, as shown by the books of the firm."

The deed contains what is called a release clause as to the debts secured in the third, fourth, and fifth classes, providing that "no payment shall be made on any claim in the third, fourth, and fifth classes unless the holder thereof shall within ninety days from the date of this deed agree in writing to accept his distributive share thereunder in full discharge of all personal liability on the part of the grantors herein on account of said claim."

The debt due the plaintiff, as stated in its original bill, is evidenced by a bond of the firm for $15,000 dated 15th August 1892 payable on demand and waiving the homestead. The firm were heavy customers of the plaintiff, and this bond represented the line of credit given the Messrs. Johnson, although by purchasing goods and making remittances, the actual amount due was varying from time to time.

The bill alleges that F. D. Johnson had insured his life in sundry reliable and solvent companies to an aggregate amount of $15,000 for his own benefit, and, at the time of the execution of said bond, had assigned these policies to the plaintiff as collateral security for the debt, which bond and assignment the plaintiff still holds. But it alleges that much the larger part of its debt would not be paid under the deed, as there would probably be but a small percentage, if any, paid to the creditors of the fifth class and that by accepting its distributive share under the said deed, as therein required, "in full discharge of all personal liability on the part of the grantors therein," it will no longer have any insurable interest in the life of F. D. Johnson, and the entire benefit of said insurance policies will thereby revert to said F. D. Johnson free from all liens and liabilities for any of his debts that share in the trust fund.

The bill further charges that both the grantors were owners of other valuable assets, real and personal, not conveyed by the deed, and the deed "manifests an intention, and is an attempt on the part of the grantors, to protect a part of their property by giving up another part, and such an attempt renders the deed fraudulent and void." All the pieces of property then known to the plaintiff as belonging to the grantors and not conveyed by the deed, are specified in the bill. The Messrs. Johnson, the trustee, and the creditors named in the deed are made defendants, with waiver of answer under oath, and the prayer is that said deed be set aside and annulled as fraudulent and void as to plaintiff's debt, and that the property conveyed, or the proceeds thereof, be applied to payment of plaintiff's debt, etc.

The day after said bill was filed, the Messrs. Johnson executed and recorded another deed, called a supplemental deed, whereby, after reciting the execution of the first deed, and that they had omitted to include therein their household and kitchen furniture and certain interests in real estate, which omission was made "for the sole reason that said articles of furniture and real

estate were deemed of such trifling value as would entail a burden rather than a benefit upon the trust fund," and that it was their intention "to convey, under said deed, all and every atom of estate in which they were interested, either jointly or severally, which could be made available in furtherance of the objects of said deed," they conveyed to the same trustee "all the household and kitchen furniture severally belonging to them," and certain described interests in real estate, "and all other real estate, if any he found, wherever situated, belonging to said F. D. Johnson & Sons, individually or as partners" all upon the same trusts declared in the first deed. But, revoking the release clause in said first deed, it was provided in lieu thereof that "no payment shall be made under said deed, nor under this deed, which is supplemental thereto, upon any claim in the third, fourth, or fifth classes named in said first deed, unless the holder thereof shall, within ninety days, enter into an agreement or covenant, in writing, that in consideration of his distributive share under said deeds he will not sue for or enforce collection against said F. D. Johnson & Sons of any balance or sum that may remain due on account of said claim."

Then the defendants filed demurrers and answers, in which answers the Messrs. Johnson and their trustee deny all intention of fraud or wrong doing, saying that the property not conveyed in first deed was not withheld for the purpose of securing any advantage to the grantors but was omitted from the deed on the advice of their counsel and trustee, who thought the administration of such assets would entail a burden on the fund, that the household and kitchen furniture was liable for rent accruing after date of the deed, in a sum larger than the value thereof, and that the lien for rent thus to accrue constituted a first charge on said property paramount to the rights of the general creditors. They further assert that the first deed conveys every dollar of estate owned by them, either jointly or severally, *supposed* to have any appreciable value, and that they believed the property conveyed was sufficient to discharge their entire indebtedness. They deny that the acceptance of the deed will at all interfere with plaintiff's rights to hold the insurance policies as collateral for the residue of its claim, if any, and they further say the omitted property was of trifling value, and they also set up the execution of the second or supplemental deed as curing any objection that might have existed against the first deed.

Soon after these demurrers and answers were filed, to wit, on 10th of June 1893, the plaintiff, by leave of the Court, filed an amended bill, whereby it alleged among other things as follows:

In the said original bill no allegation was made that the trustee in said deed and the creditors therein secured had notice of the facts render-

ing the same void, but complainant relied upon the constructive notice furnished by the deed itself. Since the filing of said bill, facts have come to the knowledge of complainant which warrant the allegation and complainant does now specifically allege that said trustee and the said secured creditors had notice of the facts rendering said deed void, outside of the constructive notice afforded by the deed itself. Complainant does not mean to be understood as charging said trustee with any fraudulent collusion, or with the slightest dishonesty of purpose, but with sufficient knowledge of the legal effect of said deed and of the omission on the part of the grantors to include *all* of their social assets, and *any* of their individual assets in the assignment, to debar him from maintaining in this suit the position and rights of a purchaser for value and without notice.

This amended bill was also demurred to and answered, but the cause was proceeded with, and it is now for the first time submitted to the Court upon all the pleadings, a voluminous mass of testimony in the shape of depositions and exhibits, for decision upon all the questions involved. The cause has been fully argued with signal ability, displaying great diligence and research on the part of counsel. Inasmuch as the zeal of opposing advocates has betrayed them into some criticism of each other, it may be well to observe at the outset that the Court perceives no cause for reproach, either as between the parties or their attorneys. The defendant's counsel complain of plaintiff's counsel for instituting this suit before apprising them of its grievance and intention, saying that any supposed wrong or cause of suit would have been gladly corrected. And plaintiff's counsel characterizes defendant's answers as abounding "in reckless denials and denunciations of the plaintiff." The language employed by both sides in the pleadings, testimony and arguments is undoubtedly tinctured with some asperity, which should be avoided, but the *acts* of the parties and counsel are not open to objection or criticism. The Messrs. Johnson, being unable to meet their obligations, sought to exercise their legal right of making an assignment, preferring whom they chose, and without consulting the plaintiff, placed over $10,000 of its debt in the last class, and required it to take what it could get there and release the balance of its claim, or else stand off altogether and see all the property conveyed distributed to other creditors. And on the other hand, the plaintiff, being so placed, sought by bringing this suit to exercise its legal right of upsetting the defendant's work and acquiring a first lien on the property conveyed and letting the rest of the creditors take care of themselves. The debtors sought to prefer others and to postpone the plaintiff; the plaintiff sought to prefer itself and postpone

others. Neither gave the other any previous warning of their intention, and doubtless for the same reason. The plaintiff having given defendants a Roland for their Oliver, there is no occasion for considering this case otherwise than in the unprejudiced light of the law and the testimony.

The ground of demurrer to the original bill is that it does not allege that the trustee or beneficiaries had any actual knowledge or notice of property belonging to the grantors not included in said deed and no notice of any fraudulent intent in making the assignment. And that as a trustee and secured creditors are purchasers for valuable consideration, they are not affected by any fraud, if any there was intended or committed by the grantors. And that while the amended bill does allege such notice, yet that before said bill was filed the supplemental deed had been recorded, which it is contended cured the invalidity, if any existed in the first deed, and the rule of equity practice does not allow the amended bill to relate back to the time of the institution of the suit, when rights of other parties have accrued in the meantime, but will treat it *quoad* those rights, as the beginning of the suit.

In considering these points, the first question that arises is was it essential to the plaintiff's suit that it should allege and prove such notice? The Virginia decisions have established the doctrine that the trustee and creditors secured are purchasers for value. If, as a result, it is held to be necessary to invalidate a fraudulent trust deed that they should have previous knowledge and notice thereof, then the way is made straight and broad for the protection of all sorts of fraudulent conveyances. For it is also established that it is not necessary to the validity of any such trust deeds that either the trustee or any secured creditor should accept it or have any knowledge whatever of it, except such as and when he gets it from the recordation thereof, and even if the trustee then refuses to act, another may be appointed.

A debtor intending to make a deed to the detriment of any particular creditor, or one containing harsh and inequitable discrimination, does not usually call his creditors into his confidence but notifies only the drawer of the deed, and if lack of notice in the secured creditors and trustee is a valid impenetrable shield to the transaction, then he will surely not impart such notice. It would be a vain thing for the law to forbid, as it does, deeds of assignment exacting releases from creditors, where all the debtor's property is not conveyed, and at the same time declare that such deeds were perfectly good and valid in all cases where the trustee and creditors had no knowledge that the debtor owned other valuable property omitted from the deed. It needs no ghost to come from the grave to tell us that all debtors who choose to do so could avail themselves of this easy plan of voluntary bankruptcy. Suffice it to say here, that the law forbids such deeds, regardless of notice on the part of the

grantees. The principle on which they are forbidden is in no wise predicated upon the existence of a guilty intent or knowledge *either in the grantor or grantee.* A reference to any one of the leading authorities on the subject discloses this.

We lay down the proposition that a creditor who comes into a court of equity, alleging that his debtor has executed a deed conveying a part of his property to a trustee for the benefit of such creditor and others, but that his debtor owns other valuable property otherwise liable to plaintiff's claim, and that such deed, by exacting a release, puts the plaintiff to the alternative of looking alone to the property conveyed, or looking alone to that unconveyed for the satisfaction of his claim, he states a good cause of action, no matter what the measure of his relief may be. In point of fact, the debtor himself may have been, at the time he executed the deed, ignorant of his ownership of the omitted property, as for example, it may have just vested in him, by inheritance, devise, or legacy from one of whose death he was ignorant, or by the decision of some suit of which he was not informed. Here the grantor would be innocent of intentional fraud, and both he and the grantee, unconscious of any property omitted from the deed, yet as all his property, saving the legal exemptions, is liable for his debts, the principle requires that it should be held so liable notwithstanding the deed. The law itself has time out of mind prescribed exemptions of property to debtors, which must apply to all cases, and debtors are not allowed to make their own exemptions, whether they give notice or do not give notice.

Moreover, in the cases which have arisen in Virginia in suits like the present, the question of notice in the grantees is not at all considered. These cases will be more particularly examined hereafter, when it will be seen that the principle by which they were decided is wholly outside of the doctrine of notice.

It may be said further that the doctrine which the defendants invoke to sustain their demurrer requires that, in cases where it is applicable, the parties protected should be not only purchasers, but *purchasers without notice,* and while the bill shows that defendants are purchasers, it does not show that they *were without notice,* and as the defendants are seeking to sustain the attitude of a particular class prescribed in the statute as an exception, it was not necessary for the plaintiff's bill to negative the fact of defendant's belonging to that class, because it was purely matter of *defense* to be affirmed and proven as such. See Judge Richardson's opinion, *Rorer Iron Co. v. Trout,* 83 Va. 397, 415 (1887), where the authorities directly in point will be found, and *Lamar v. Hale,* 79 Va. 147 (1884).

As to the constructive notice afforded by the deed itself, the defendants are chargeable with notice of the facts appearing in the deed as of the time of its execution and all other facts that might have been discovered by the strictest enquiry where ordinary prudence would have suggested an inquiry. See *Peters v. Bain*, 133 U.S. 670 (1890), following Judge Carr, in *French v. Loyal Co.*, 32 Va. (5 Leigh) 627, 641 (1834); *Wait on Fraudulent Conveyances*, §§ 573-4; *Rorer Iron Co. v. Trout*, 83 Va. 397, 419 (1887). The deed showed large partnership assets and heavy indebtedness (though it does not even give an idea of the amount of such indebtedness). It conveyed certain particularized property, and "all other personal property belonging to said firm."

It did not convey any real estate of the firm, nor any estate real or personal of the individual partners. In view of the legal requirement that such a deed must convey all the property of the firm and of each of the partners, it would seem that ordinary prudence would have suggested an enquiry on the part of the grantees, and surely the "strictest enquiry" would have put them in possession of the facts as to the omitted property, and they are chargeable, therefore, with a knowledge of these facts.

Furthermore, the amended bill discloses why the allegation of notice therein contained was not inserted in the original bill, namely, that plaintiff was not aware of the fact until it was disclosed in the answers of defendants. All the authorities hold that plaintiff, making a good excuse for omitting even essential matter from his original pleading, will be allowed to amend, and the excuse here given is sufficient; nor do the circumstances indicate that plaintiff could have informed himself by reasonable diligence, for he had no right to interrogate the defendants as to this matter. Certain it is that the new matter alleging notice was within the range of amendment, under the liberal rules of pleading now obtaining in this state. See Judge Staples' opinion in *Belton v. Apperson*, 67 Va. (26 Gratt.) 207 (1875), where this subject is thoroughly discussed.

The object of both bills was the same, the kind and measure of relief sought were the same, the parties were substantially the same, and although the parties were at issue upon the original bill, yet no testimony had been taken nor hearing had.

It is not perceived that any rights had accrued between the filing of the two bills which will be prejudicially affected by treating the amended bill as a continuation of the suit, having relation to the time of instituting the suit, and, therefore, it is so treated agreeably to the usual practice. 1 Barton's *Chancery Practice*, 249, 323, 329 (1881), and *Morrison v. Householder*, 79

Va. 627 (1884), where it was treated as a continuation of the suit, though the right to plead the statute of limitations had accrued since the original bill.

It is contended that the second deed destroyed all cause of action, if any existed, as against the first deed, and that the two deeds should be considered as one. It is to be noted that the second deed does not convey nor in anywise affect the property conveyed in the first deed, which deed had already been attacked. It conveys the property omitted from the first deed, which was pointed out by the plaintiff's bill, and substitutes for the release clause the requirement "not to sue for or enforce collection against said F. D. Johnson & Sons of any balance that may remain due." As the second deed omitted the great bulk of the property, to wit, all that embraced in the first deed, it follows that if the first were void or voidable, so is the second, unless they are to be considered as one, and the non-suable requirement substituted for the release requirement is made to relate to the first deed, both as to time and property.

It is not perceived how the second deed can be made to relate back to the time or property embraced in the first deed in the teeth of the fact that the plaintiff had already instituted his suit, and nothing the defendants could then do could prejudice his rights. The statute by virtue of which this suit was brought gives the plaintiff, in case it succeeds, the same rights it would have, had it obtained judgment against defendants at the time of the commencement of this suit. Section 2460, Code 1887. Granting, too, the right of the Messrs. Johnson to revoke the release clause, which is by no means clear, the substituted clause would have about the same effect upon this deed as the release clause. For it has been decided that where the deed leaves it in the power of the debtor to hinder, delay, or defraud his creditors beyond the permission of the law, by holding them aloof from his property while he enjoys it, this deed is invalid. *Perry & Co. v. Shenandoah Nat. Bank*, 68 Va. (27 Gratt.) 755 (1876). In that case the deed, by implication, left it in the power of the debtor to enjoy his property for two years, but only in case no creditor demanded a sale. So, also, in *Quarles v. Kerr*, 55 Va. (14 Gratt.) 48 (1857), where the trust deed failed to convey a stock of merchandize, and provided that Kerr, the grantor, should remain in possession for two years, and longer, unless a majority in amount of the creditors should request a sale, and further provided that, in case any creditor should sue out execution before the deed was carried into effect, he should forfeit all right under the deed, the Court said, p. 57:

> The deed seeks to impose on his creditors secured the alternatives of looking to the deed only for security and giving up for an indefinite time the right to pursue the debtor's other property by legal process,

or of forfeiting any claim under the deed. This is a palpable attempt to use one portion of the debtor's property to protect another portion from his creditors. We have seen that this cannot be done when the protection sought is for all time, and the principle is the same when sought for a limited time.

In the case at bar, the protection sought against suit or collection by the second deed was for all time, and hence the effect is the same, so far as that is concerned, as if the release clause had been inserted. 20 Am. and Eng. Enc. 741. The authority cited by counsel in support of the point that a covenant against suit in such a deed is not equivalent to a release and is permissible, by no means sustains the point. It is the case of *Ward v. Johnson*, 20 Va. (6 Munf.) 6 (1817), holding simply that a covenant not to sue one of two joint and several obligors does not at law discharge or release the other obligor, there being by the terms of the covenant an implied power reserved of suing such other. See also *Goodnow v. Smith*, 35 Mass. (18 Pickering) 414, 29 Am. Dec. 600 (1836); Bacon's *Abridgement*, title "Release A," where *Ward v. Johnson* is cited. Counsel also cite *King v. Norfolk and Western RR. Co.*, 90 Va. 210, 17 S.E. 868 (1893), to the effect as stated in the syllabus that "where a deed is made to correct a mistake and supply an omission in a previous deed between the same parties, it is proper to construe them together." But it is manifest that case has no bearing on one like this. It was the case of one deed being made to correct a mistake and misdescription of land conveyed in a former deed, and the suit was between the parties to both deeds; here the two deeds relate to different property, and the suit is not between the parties to the deed, but between a party to the deed on one hand and his creditors on the other. The case has no more relation to this case than it has to the case of a judgment creditor seeking to subject Blackacre to his lien, where, after his lien attached and his suit is brought, the debtor makes a second deed conveying said Blackacre to one to whom he had theretofore conveyed Whiteacre. Would it be seriously contended that, even though Blackacre was inadvertently omitted from the first deed, the two deeds would be construed together so as to defeat the judgment creditor? Assuredly not. But if these two deeds are taken together it must be remembered that a covenant never to sue at all nor enforce collection, which would deprive a pledgee of realizing on his pledge, is equivalent to a release. 3 *Addison on Contracts*, bottom page 837; 20 Am. and Eng. Enc. 741.

This disposes of all points as to the pleadings, as to which the Court is of opinion: 1st. That no allegation of proof of notice on the part of the grantees as to the omitted property was essential to the plaintiff's suit. 2d. That the

deed in this case conveyed constructive notice by putting the grantees upon enquiry. 3d. If lack of notice would protect the grantees, it is matter of defense to be set up by plea or answer. 4th. The allegation of actual notice contained in the amended bill relates back to and forms a part of the original bill. 5th. It is not made to appear that any rights had accrued between the filing of the two bills which are injured by so treating the amended bill. It follows, therefore, that the demurrers are overruled.

As to an account for $799.47 of the plaintiff against Messrs. Johnson, inadvertently omitted from the original bill and set up for the first time in the amended bill, the same is entirely new matter, and plaintiff's right as to that claim is wholly by virtue of the amended bill.

Coming, then, to consider the cause on its merits, the leading principle by which it is to be determined will first be noticed. That principle is that where the debtor makes a general deed of assignment for the benefit of creditors and exacts of them as a condition of sharing in the trust fund a release as to any part of their claims remaining unpaid, it is necessary that such assignment carry all the debtor's property that could otherwise in any way be subjected to his debts.

In very many, if not most of the states, the doctrine allowing a debtor to exact releases of his creditors by surrendering all his present property, does not prevail, and it is so manifestly contrary to the theory and reason of the law that many of the ablest judges of the country, including Chief Justices Marshall and Taney, and a number of the best law writers have vigorously condemned it as being pernicious and unjust. The theory of the law, as well as the common sense of this work-a-day world, is, that not only is the debtor's present property, saving his legal exemptions, liable to the payment of his debts, but his future earnings and accumulations as well. In fact but a small proportion of the credit given in the commercial world is based solely upon the debtor's present property, but his character, habits, hopes, expectations, chances, and capacities of money making or accumulating property by purchase or gift are taken largely into account and often form his sole basis of credit. Yet, under the rule stated, he may deprive his creditor of all these sources of payment and free himself of debt, regardless of the percentage paid upon his debts. When to this high prerogative is added the unrestricted right of preferring one creditor to another, which also obtains in this state, a power is conferred which it is not surprising should be often used to perpetrate wrong and injustice under the sanction of law. The objections to the doctrine will be found stated at length in *Bump on Fraudulent Conveyances*, pp. 433, 429, *Burrill on Assignments*, 283, and by Mr. Justice Sutherland in *Grover v. Wakeman*, 11 Wend. 187, 1 Am. L. C. 92 (N.Y. 1833).

But the rule as stated, though strongly condemned by some of our judges, is now so firmly established that nothing short of legislative enactment can abolish or regulate it.

The leading Virginia cases are *Skipwith v. Cunningham*, 35 Va. (8 Leigh) 271 (1837), decided in 1837; *Quarles v. Kerr*, 55 Va. (14 Gratt.) 48 (1857); *Gordon v. Cannon*, 59 Va. (18 Gratt.) 387 (1868); and *Paul v. Baugh*, 85 Va. 955 (1889), and cases there cited. The rule is sometimes stated as requiring, when releases are exacted, that *all* the debtor's property must be conveyed; and again, *that all, and not a part*; and again, that *the whole*; and finally, that *"substantially the whole* of the [debtor's] property [must] be conveyed." *Robinson v. Mays*, 76 Va. 708, 716 (1882). Each of these expressions have the same meaning and are to be applied not technically and absurdly but reasonably and with practical reference to the philosophy of the rule. For example, a deed conveying a valuable property to satisfy large claims would not be disturbed for omitting to convey a canary bird and cage, or a pet lamb, or bank of ashes, though they might possess some pecuniary value. So likewise for omitting a lot of junk such as accumulates on most everybody's premises, of which no account is usually taken. Yet if a junk dealer were to make such a deed and omit his stock in trade, the case would be very different, not only as evidencing his intention, but because the legal rights of his creditors would be practically interfered with. The principle is founded on the theory that the creditors, each and all of them, have a right to look to *all* the debtor's property, saving his lawful exemptions, and therefore he has no right to convey a *part* of his property for their benefit upon condition that they release the other part. He must dedicate all his property to his creditors, if he would exact releases and thus free his subsequent earnings and accumulations from their claims.

A brief notice of the facts appearing in the leading Virginia cases will still further serve to illustrate the proper application of the rule. In *Skipwith v. Cunningham*, 35 Va. (8 Leigh) 271 (1837), the debtor conveyed all his property, though he reserved out of the trust fund $350 "for the purpose of paying some small debts of high honorary obligation." The Court said "this reservation for so laudable a purpose, out of the avails of a very large and valuable estate, cannot be void in itself, and cannot render the deed void." It must be noted that the entire property was conveyed, including this $350, and the whole of it was dedicated to the payment of his debts. As to the $350, the grantor undertook himself to distribute that among the creditors whom he had a right to prefer, and no question was made as to the existence of such debts, nor of the debtor's purpose properly to apply every cent of it to their payment. The deed was sustained as coming within the rule.

In *Kevan v. Branch*, 42 Va. (1 Gratt.) 274 (1844), all the debtor's property was conveyed, and the deed accordingly sustained.

In *Phippen v. Durham*, 49 Va. (8 Grattan) 457 (1852), the party attacking the deed contended that certain property was omitted from the assignment, because it was shown that some time after the date of the deed the grantor owned choses in action of the face value of $131.65, three old stoves, and an interest in some western Virginia lands forfeited for non-payment of taxes. The lands being forfeited, presumably beyond redemption, really did not belong to the debtor, and there was no proof of value whatever as to the choses in action and stoves, nor that they belonged to him at the date of the deed. Hence the deed was sustained.

In *Quarles v. Kerr*, 55 Va. (14 Gratt.) 48 (1857), the deed omitted to convey valuable stock of merchandise and was annulled for that reason.

In *Gordon v. Cannon*, 59 Va. (18 Gratt.) 387 (1868), there was no property omitted, and the deed held good (page 397). The Court expressly decided in this case that such an assignment by a partnership to pay partnership debts must convey all the individual property of the partners as well as all partnership property.

In *Paul v. Baugh*, 85 Va. 955 (1889), all the debtor's property liable for debt was conveyed except a nominal equity of redemption in certain real estate on which the encumbrances prior and paramount to the deed far exceeded its value. So that in effect all the property was conveyed and the deed sustained.

It is seen, therefore, that to invalidate the deed, the property omitted or reserved to the debtor's use must be of some value and appropriable by law to the satisfaction of the debt required to be released. Of the foregoing cases the only one where any such property was so omitted or reserved is that of *Quarles v. Kerr*, in which case the deed was set aside. No notice need be taken here of cases wherein the reservation of property to the grantor's use was for a limited time only, for in the case at bar the alleged reservation by way of omission from the deed is for all time.

We come now to enquire what property, at the date of the deed, was owned by Messrs. F. D. and J. B. Johnson, both individually and as partners, which was liable for their debts and which was not conveyed by their deed of assignment. This property as claimed by the plaintiff may be itemized as follows:

1st. Certain vacant lots of land near Lynchburg and other towns.
2d. The household and kitchen furniture of F. D. Johnson.
3d. The household and kitchen furniture of J. B. Johnson.

4th. Five shares of Bohls Cigarette Machine Company stock, par $100 per share.

5th. Insurance policies on the life of F. D. Johnson, payable to himself, aggregating $15,000.

The foregoing items of omitted property were specified in the plaintiff's original bill. In the examination of witnesses, it was developed that F. D. Johnson owned a carriage and that J. B. Johnson owned endowment insurance policies on his own life payable to himself to the amount of $4,000, which were likewise not conveyed. It is not claimed by defendants that any of this property is exempt by law from liability for debt, and each item will be considered *seriatim*, though it is impracticable to enter into details of evidence.

1st. As to the town lots, it appears that those near Lynchburg were sold during the past summer at auction, under the second trust deed, and brought $138.50, from which must be subtracted the cost of advertising and selling, leaving a balance of $71.50. It is manifest that *none* of these lots were conveyed in the first deed, and it is clear that the South Lynchburg *stock* had been merged or converted into the lots before the trust deed was made.

2d. The household and kitchen furniture of F. D. Johnson, as well as that of J. B. Johnson, was valued and appraised by S. F. McGehee and W. B. Montgomery, acting at the request of the Messrs. Johnson, after this suit was brought. These appraisers were furnished with a list of articles exempt from levy as specified in the Code, and they did not include such in their appraisement. Although the appraisement has been attacked on the ground of under-valuation and because it allowed one valuable sideboard to each of the Messrs. Johnson as coming under the exemption of "one press or safe," still it affords the best evidence of value in this record, and the Court adopts it both as to valuation and the allowance of the exemptions. They put F. D. Johnson's furniture at $219.25, but failed to include therein a certain piano in his house costing a few years ago about $200, and a suite of furniture bought in 1885. These were omitted because, though bought by Mr. Johnson, they had been given by him verbally to his daughter several years ago. Section 2414 of the Code provides that no gift except by deed or will shall be valid unless actual possession shall have come to and remained with the donee, and that, if the giver and receiver reside together (as was the case here), possession at the place of their residence shall not be sufficient. The daughter to whom they were given left them at her father's when she left on her marriage five years ago, and they still remain there, though she made a verbal gift of the piano to her sister. There can hardly be any doubt that this property was liable to the

creditors of Mr. Johnson. In *Hunter v. Jones*, 27 Va. (6 Rand.) 541 (1828), it was decided that a verbal gift by father to his infant child living with him, without delivery of possession, was not good against a subsequent purchaser, although such purchaser knew at the time of purchase that the father had made the gift.

3d. J. B. Johnson's furniture was valued by the appraisers at $97.00, but they did not include therein a piano which cost, a few years ago, $335, for the reason that it was claimed to belong to his wife. Mr. Johnson testifies, however, that he paid about $200 of the price and that his wife paid the balance; but as it seems she had no separate estate, under the principles governing such cases, this piano was liable to his debts. See *Yates v. Law*, 86 Va. 117 (1889).

It is argued that none of the property upon the residential premises of Messrs. Johnson should be treated as omitted from the trust deed, because the whole of it was liable for their rent accruing subsequent to the deed and up to the expiration of their respective leases. A brief recurrence to the fundamental principle will solve this question. The theory is that all the property is liable to each debt, and if the debtor omits to convey valuable property, it matters not whether he has likewise omitted to secure in his deed certain debts sufficient to exhaust the omitted property or not, for each secured creditor of whom a release is required is entitled to have all his property covered by the deed whether there be other claims unsecured or not, otherwise the transaction would come directly in conflict with the rule announced. The simple fact of exclusion of the property from such a deed, is a dedication of it to the grantor's use where it is not under a specific lien, and even then *quoad* the equity of redemption, whatever that may be worth.

The result as to this identical property illustrates and proves the correctness of this position, for the evidence shows that none of it was used in the payment of rent; and what is still more to the point the rent of F. D. Johnson's dwelling for three months in advance was secured by the deed in the third class. If, as a matter of fact, this property had been subjected to the payment of rent, and no rent had been secured in the deed, it would then be a fact in the cause that the trust deed creditors had lost nothing by its omission from the deed, and if, in that case, the property failed to satisfy the rent, it would appear that the trust deed creditors were gainers by its omission; for by its being conveyed and the whole rent being secured, they would have lost the amount of difference between the value of the property and the amount of rent. But we must deal with the facts as they exist in this cause, and applying established principles to existing facts, it is evident that this property should have been included in the deed, for the result of its omission has been to

release it from liability for all the debts secured, while the debtors enjoy it, and have appropriated $400 from the partnership assets to pay the individual debt of one partner for rent of his residence.

4th. The five shares of the Bohls Cigarette Machine Company's stock is of the par value of $100 per share, but defendants claim that it has no market value, and they deny that it belonged to F. D. Johnson, but say it was partnership property, and was conveyed by the deed.

The whole of the granting clause of the deed is as follows:

> All the stock of goods, wares, and merchandise in their storehouse, 1028 Main Street, Lynchburg, Va., consisting of gold and silver ware, diamonds, jewelry, watches, etc.; all their store and office furniture, including their iron safe; all tools and appliances used in their business; all debts and claims due the said firm, whether evidenced by bonds, bills, notes, books, accounts, checks, or otherwise; all monies of said firm in hand or in bank, the unexpired lease of said storehouse terminating January 1, 1894, and all other personal property and effects of every description belonging to said firm.

The certificate for this stock was issued to and stood in the name of F. D. Johnson, and was in the possession of Mr. Gilliam as collateral for an endorsement for the firm, though it is claimed to have passed under the deed as coming under the head of "all other personal property and effects of every description belonging to said firm." The rule of construction known as the maxim *ejusdem generis* is that where things of cognate nature and kind are specified, followed, or preceded by general terms which standing apart would include everything, or things of wholly diverse nature and kind, the general terms are limited to refer only to things of like kind and nature with those specifically mentioned. The books abound in cases illustrating the rule. A statute of New York mentioned *money, funds, credits, and property*; [it was] held that property in that connection meant only such as was of the same general character with that specified. *People v. New York etc. Ry.*, 84 N.Y. 565 (1881). And in Illinois, the word property as used in a statute defining a pawnbroker was held not to include real estate. In the case of *Quarles v. Kerr*, 55 Va. (14 Gratt.) 48 (1857), the deed was similar to this and conveyed certain slaves, horses and other live stock, all farming utensils, corn, rye, oats, wheat threshed and in the ground, hay, household and kitchen furniture, specifying the articles, books, pistols, six or seven barrels of apple cider, concluding the enumeration with "and *all the personal property of every kind whatsoever* belonging to" the debtor. This was very comprehensive phraseology, and it

was contended that it conveyed all of Kerr's property. But that Court said, p. 56: "The minute specification of numerous articles of small separate values, shows that it was intended to name every piece of property and that the terms, 'all the personal property,' etc., were not intended to embrace the stock of merchandise worth thousands of dollars. This is the contemporaneous construction of the deed" by the grantor, the trustee, and the creditors. I think this language is well nigh if not quite as pertinent to the case in hand as it was to that case. Independent of any contemporaneous construction given the deed by the acts of the parties, the deed itself ought to show what passes, and it should pass as a legal right by virtue of the conveyance and not by subsequent consent of parties; it goes without saying that an execution creditor of F. D. Johnson or a purchaser from him of this stock after the recordation of this deed would have a perfect title to it as against the trustee. The deed does not describe the stock. See also 1 Am. and Eng. Enc. 854; *Burrill on Assignments*, § 137, etc.

The value of the stock is uncertain. It seems to be a speculative stock, without any fixed market value at present, though it is paying twenty-five per cent *per annum*, which is assured by contract for two years from the making of this assignment. These dividends alone would add to the trust fund $250, and its real and ultimate value beyond the said dividends is dependent upon the result of litigation now in progress and which may terminate at any time either favorably or disastrously. Mr. Cohn, who is a director and large holder and the only witness touching its value, testified that he would not sell for less than par, and he had sold some at par and he believed it to be now worth that, but he would not give it in the present stringent money market, and that he did not think the stock could now be sold in the open market. The certain cash market value at the date of the deed is not the sole criterion of value, but the question is rather what might it be made to yield to *the trust fund*. This point will, however, be considered further on, and we now turn to the argument of defendants, that this stock being already pledged as collateral security to Mr. Gilliam, to secure him as an endorser, could not be interfered with by the trust deed. Certain it is that no deed could prejudice the validity of the pledge theretofore made, but it must be remembered that the whole of Gilliam's debt, or his liability rather, was amply secured in the deed, being placed in the second class, and no doubt was entertained then and no question raised now as to his being fully secured. The holders of the notes can collect the whole of their claims from the trust fund, and thus free the cigarette stock from the pledge, in which case it would of course revert to the owner, the pledgor, Mr. Johnson. Were it in the power of the other secured creditors to force the application of the pledged stock first to the payment of those liabilities,

allowing only the balance of such liabilities to share in the trust fund, they would not be prejudiced at all by its omission from the deed, but it is not conceived that they have any such right.

The inexorable logic of the principle announced as governing these release deeds, requires that where the debtor has prior to his deed specifically pledged or encumbered a portion of his property for the payment of a particular debt, he should nevertheless include the property in his general assignment, subject, of course to the prior pledge. The only case in which it could be safely omitted is where the property pledged is utterly insufficient to discharge the specific lien, and not even then if the whole debt is provided for in the deed. In all such cases the creditor is entitled to have all the property and estate of his debtor open to his pursuit. If the pledged property be included in the deed the trustee or Court can protect the rights of the respective parties, and if it be omitted, it is at the peril of the grantor, for he is acting *ex parte*. The conclusion therefore is, that this Bohls stock was not, but ought to have been, conveyed by the deed, whether it belonged to the firm or either partner.

The 5th item of property claimed to be omitted is $15,000 of insurance policies on Mr. F. D. Johnson's life payable to himself and assigned a year or two ago to the plaintiff as collateral security for whatever the firm might be owing.

A life insurance policy is a chose in action belonging, as other choses in action do, to the person to whom it is payable (whether originally or by transfer), payable either at a definite time or on the happening of an event, which event usually is as certain as the flow of time itself, and containing covenants to be performed meanwhile by the insured or payee on penalty of forfeiture of all or part of the demand. Owing to some peculiarities in this kind of contract, a multitude of questions have arisen in modern days in regard to them, and there is naturally some conflict among the adjudications. But the established principles controlling other contracts and choses in action will usually be found sufficient to solve most of the questions involved, any supposed public policy exempting these contracts from those principles to the contrary notwithstanding. The wisest policy for the laws of an intelligent people is to uphold and enforce, and not annul, contracts. Some authorities hold that these policies cannot be sold and assigned outright, clinging doubtless to the traditions of the common law against the assignability of all choses in action. But as the commercial State of New York is leading the way in the direction of permitting their absolute sale and transfer, it is believed that the demands of trade and the increasing use of this species of property as a basis of credit will cause it, in a few years, to become generally so recognized. *St. John v. American Ins. Co.*, 13 N.Y. 31 (1855); *Olmstead v. Keyes*, 85 N.Y.

593 (1881). For a general discussion of this subject see notes to *Morrell v. Trenton Ins. Co.*, 64 Mass. (10 Cush.) 282, 57 Am. Dec. 92 (1852), and *New York Life Ins. Co. v. Flack*, 3 Md. 341, 56 Am. Dec. 742 (1842), and the works of May and Bliss on insurance.

The assignment of Johnson's policies to the plaintiff was made purely as a basis of credit and for its indemnity, which character of assignment is everywhere recognized.

The plaintiff contends that if it had accepted the trust deed, executing the release of its debt as thereby required, its whole debt being thus settled and compromised, it would no longer retain any insurable interest in Mr. Johnson's life, and all interest in the policies would *ipso facto* revert to him, and no interest in the policies being conveyed by the deed, they would in that view be a valuable asset omitted therefrom. The defendants contend that there was no thought of interfering at all with the plaintiff's interest in the policies, and that the release required by the deed would not in fact or in law destroy the plaintiff's insurable interest in the life of the assured or in any way prejudice its rights as to this collateral.

That interest in another's life which will support a contract of insurance, called insurable interest, is well defined by Mr. Justice Field in *Warnock v. Davis*, 104 U.S. 775 (1881), and as that definition has been approved by many authorities, including our Court of Appeals in *Roller v. Moore*, 86 Va. 512 (1889), it will be here quoted as follows:

> An insurable interest may be stated generally to be such an interest arising from the relations of the party obtaining the insurance, either as creditor of or surety for the insured, or from the ties of blood or marriage to him as will justify a reasonable expectation of advantage or benefit from the continuance of his life . . . . But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the insured, otherwise the contract is a mere wager by which the party taking the policy is directly interested in the early death of the assured.

See also *Connecticut Mut. Life Ins. Co. v. Luchs*, 108 U.S. 498, 503 (1883); 57 Am. Dec.

In other words, to put it briefly, the beneficiary must have a pecuniary interest or reasonable expectation of benefit in the life, and not alone in the death of the insured, in the continuation of the life and not its termination.

While it has been held rightly that though a debt be not capable of enforcement at law, as when it is barred by limitations or bankruptcy, yet it constitutes an insurable interest, and it would seem that this ought unquestionably be so where the insurance was effected before the bar applies. Yet a different question arises where the bar to the action at law arises, not by operation of law, but by act of the parties.

There are a number of respectable authorities to the effect that where the insurable interest exists at the inception of the contract, or where the policy valid in its inception and procured in good faith is assigned to one having no such interest, the beneficiary or assignee may nevertheless enforce such policy. *Bliss on Insurance*, § 30; *Olmstead v. Keyes*, 85 N.Y. 593 (1881); 57 Am. Dec.; *Connecticut Mut. Life Ins. Co. v. Schaefer*, 94 U.S. (4 Otto) 457 (1876).

I apprehend the true doctrine as to creditors to be that insurance effected by or for one who has no insurable interest in the life of the insured is a wagering policy and void. But when the insurance is validly effected either by a *bona fide* creditor, or by the assured himself and properly assigned to such creditor, and the insurable interest of the payee or assignee is afterwards determined as by payment of the debt, the insurance is not rendered void but continues as *against the company* for the benefit of the insured or the party to whom it was payable before assignment. Where the insurable interest has so terminated by settlement of the parties, yet the assignment remaining uncancelled, the assignee could recover the insurance but would hold it as trustee for the party really entitled.

So, the real question here is, would Johnson owe the plaintiff anything after the execution of the release required by the deed? If so, its insurable interest would continue; if he would owe it nothing, the plaintiff could not hold the insurance money, even if it collected it, as against Johnson's personal representative and, hence, would have no right to retain the policies.

The transfer of the policies to the plaintiff was a *contract* by way of pledge for the *payment* of its claim, and in order to see whether the debt would *have been paid* by acceptance of the deed, we must see what the contract would have been between the same parties had the deed been accepted by the plaintiff. The plaintiff would have accepted its "distributive share thereunder, in full *discharge of all personal liability* on the part of the grantors on account of said claim." Not in *full discharge of its debt* but of all personal liability. Nor is it in satisfaction of the debt.

We have already seen that insurable interest may exist in favor of a creditor after all *personal liability* on the part of *his debtor* has ceased.

And as the plaintiff held a specific lien, or rather held possession of the policies by way of pledge for the payment of its whole debt, the release of its debtor from all personal liability to it, in consideration of part payment of the debt, would not necessarily destroy its specific lien nor be a satisfaction of the debt, unless so agreed, and the agreement would not be so construed unless it was clearly to that effect. The plaintiff had two sources of security for its debt, namely, the insurance policies and the personal liability of its debtors, and a release of one is no release of the other, for the release of a right is not to be construed to mean more than it says. Before the Code of 1887, payment of part of a debt would not extinguish the whole, even though it was expressly so agreed, but now it is otherwise "when expressly accepted by the creditor in satisfaction." Section 2858.

A release of all claims on a debtor for the debt does not release a subsisting lien for the same debt unless so intended. Am. and Eng. Enc., note to page 758. In *Lambert v. Jones*, 2 Pat. and Heath 144 (1856), a party to a composition deed, whereby he released all claims and demands against the grantor, was held not prevented from retaining a note assigned to him in good faith by the grantor before executing the deed, in discharge or payment of a *bona fide* debt.

The case is somewhat analogous to that of limitations barring an action at law on the obligation, but which destroys not a specific lien, the debt not being extinguished. *Coles v. Withers*, 74 Va. (33 Gratt.) 186 (1880); *Smith v. Washington City etc. RR.*, 74 Va. (33 Gratt.) 617 (1880); 7 Robinson, *Practice*, p. 503, etc. (1874). Neither would a covenant not to sue destroy a specific lien which might be enforced without suit, though it might be otherwise in case, as here, of a covenant not to "enforce collection." While perhaps, the correctness of this view may not be absolutely free from doubt, the conclusion is that the release of the grantors from all personal liability would not have destroyed plaintiff's rights in the policies it held and that Johnson being still interested in satisfying any balance due on plaintiff's debt after crediting its share under the trust deed, in order to free his policies from the pledge, that would have constituted plaintiff's insurable interest.

The cash surrender value of these policies as of the date of the deed is proven to be $1,643, and it was suggested in argument that the plaintiff could have sold the policies for that sum and proved under the deed for the balance. Suffice it to say on that point that the plaintiff had no such right to sacrifice the policies, which still belonged to F. D. Johnson. Such a sale would have been in direct violation of the contract of pledge. See *Story on Bailments*; 18 Am. and Eng. Enc., title "Pledge."

Two of these policies are endowment policies and the other ordinary life. It is not shown when the endowment policies will mature, and for the purposes of the present occasion they may all be treated as ordinary life policies. There are two contingencies upon the occurrence whereof the failure to convey these policies in the trust deed would be prejudicial to the rights of the creditors other than the Meriden Brittannia Company. First, the contingency of the policies maturing before the administration of this trust fund is completed in which case all the creditors unpaid under the deed would be losers; and, secondly, in case the plaintiff had accepted the deed and its distributive share thereunder, which reduced its debt, say to one or two hundred dollars, then the other creditors would lose the difference between such sum and the cash value of the policies, even supposing that we are shut up to considering only their surrender value.

Considering, however, the facts as they exist, the Court must conclude that these policies are not to be treated as property omitted from the deed to the prejudice of the creditors.

The sixth item of omitted property is the carriage of F. D. Johnson, which cost $205, and is insured for $150; though the evidence shows that the parties supposed this carriage was conveyed under the deed, as it is proven that the carriage belonged individually to Mr. Johnson, it having been charged to him on the firm books, it is evident that it is not conveyed by the deed.

The seventh and last item is $4,000 of endowment policies on the life of J. B. Johnson, payable to himself and not remembered when the deed was executed. The cash surrender value of three of them is $600, while the other is of a kind that the company is forbidden by its rules to purchase, though it is argued that a creditor might take it at something over $300. There is no evidence as to the date of their maturity. Counsel for defendants strongly contend that the deed could have conveyed only the cash surrender value thereof, and cite as authority the case of *In re McKinney*, 15 F. 535 (S.D. N.Y. 1883), decided by Judge Brown in the United States District Court, Southern District of New York.

That was the case of the insured holding a policy payable to himself going into bankruptcy under the late Federal law, and surrendering the policy in his schedule of assets. The assignee in bankruptcy took no steps in reference to the polices and paid no premiums, but the bankrupt's wife, being under the impression the policy was for her benefit, paid all the annual premium until the death of the insured. Then the question arose, how were the proceeds of the policy to be divided, if at all, between the bankrupt's assignee and his widow. Both claimed the whole. The Court held, that to the extent of its cash surrender value at the time of the bankruptcy the policy was "property and

effects" within the meaning of the bankrupt law; and, making a calculation of the necessary annual premiums during the average expectation of the life of the insured, it appeared that as a contract for future insurance merely, it would have been a burden instead of a benefit to the estate. For, speaking as of the date of the assignment in bankruptcy, a greater sum in premiums and interest thereon would presumably be called for to keep the policy alive than the amount ultimately payable. Hence, "aside from its surrender value the policy is not property or effects, but an incumbrance, which the assignee would have been bound to reject, like leases at an unfavorable rental." But the Court said further: "In such cases the assignee has at least *an election* to reject the contract," and, holding that he not only ought to have rejected it, as an executory contract to be kept alive, but that in fact he had rejected it as such, and that he could not wrest all the fruits of it from the widow, who had secured it, decreed that the assignee was entitled only to the cash surrender value and the widow to the balance.

This case was well reasoned and rightly decided, but it does not hold nor intimate that in all such cases the bankrupt is responsible only for the cash surrender value. On the contrary, the policy was surrendered and the Court said the assignee had the right to elect whether he would reject the contract or not, in accordance, I think, with well settled principles. For, in all cases where such policies are involved in the administration of a trust fund, they will be governed by the same principles which control the administration of other choses in action; that is to say, the trustee must use his discretion for the best interests of the trust fund, and his accountability is the same as in other fiduciary matters. If he deems it best to sell the choses in action for cash immediately, instead of waiting, even at some cost and expense, for a time or event when the amount payable will be larger, he may do so. If, on the other hand, he thinks it wiser to pay out something from the trust fund, in order to realize in a reasonable time a much greater sum he may do that; and, if in doubt or fearful of making himself accountable for loss, he may implead the interested parties in a court of equity and gets its authoritative direction. It is familiar practice in receiverships, trusteeships, etc., to order expenditure of money for completion, improvement or repair of property where it appears advisable to make a better sale. So, too, rather than sacrifice, on the instant, a solvent chose in action, the court or fiduciary will hold it until its maturity, and the same powers and same obligations apply to life insurance policies. If a short lapse of time or small outlay of money will carry it to a much greater value, as, for instance, to the endowment period, it will be so treated. Each case must be governed by the circumstances thereof, the wishes of the beneficiaries being always consulted, but the property should be surrendered

in order that their interests may be consulted. In the case at bar it is shown that the insurance companies would issue paid up policies for an amount much greater than the cash value, and some of the creditors might have preferred that. These suggestions are made to show that the policies might have been made to yield more than their cash value had they been conveyed and to show upon what grounds the court dissents from the doctrine that the court and creditors are shut off from all enquiry except as to cash value. For it may be said of the insurance policies, as well as of the Bohls cigarette stock, all are liable any day or hour to increase immensely in value, and, as "fortune brings in some boats that are not steered," the creditors are entitled to the benefit of some chances.

Moreover, it must not be forgotten that the parties to this suit treated the F. D. Johnson policies as being worth sufficient to constitute, in large measure, the means of obtaining credit to the amount of $15,000.

To summarize the value of the property omitted from the deed upon a basis as favorable to the grantors as possible, the Court finds the statement to be about as follows:

| | |
|---|---:|
| F. D. Johnson's furniture, appraised | $219.25 |
| F. D. Johnson's piano, cost $200 | 100.00 |
| J. B. Johnson's furniture, appraised | 97.00 |
| J. B. Johnson's piano, cost $335 | 250.00 |
| Net amount on sale lots | 71.50 |
| Bohls cigarette stock, $100, over dividends | 350.00 |
| Carriage, cost $205, insured for | 150.00 |
| J. B. Johnson's endowment policies, cash | 600.00 |
| Making a total of | $1837.75 |

This leaves out altogether the suites of furniture which was not valued, and the three months' lease of F. D. Johnson's residence, paid in advance by the trust fund, and one endowment insurance policy of J. B. Johnson, which, though not purchasable by the insurance company, might be probably made to yield $300 more to the trust fund; and, while the evidence might justify some alteration in the foregoing figures, it is hard to see how the total could be reduced below $1500, and even if it were no more than the half of that, it would be of substantial value.

The evidence leaves no room for doubt as to the honesty and perfect good faith of the Messrs. Johnson in making this assignment. There was no intention of fraudulent concealment or design of reserving to themselves the

enjoyment of valuable assets. They not only stated their purpose of surrendering all their property, both partnership and individual, but at first they had no intention of exacting a release from their creditors, believing that the assets would produce sufficient to pay all in full. They yielded to the suggestion of a release because it would enable them to resume business undisturbed by these claims if any were left unpaid. Nor can the slightest intimation of moral turpitude be made against any one concerned in the transaction. The grantors, the trustee, the counsel, and the creditors are, in the judgment of the Court, absolved from all suspicion of wrongdoing. In the preparation and execution of the deed, quickly following a hasty consultation, it is not surprising that some things should have been deemed of trifling value which now turn out differently and some things thought to be covered by prior liens which it is now seen should have been conveyed and that some others were thought to be included which, by reason of misdescription, are found to be omitted.

The question of actual fraud was much discussed in the argument, and it was urged that, as there was no fraudulent intent on the part of any party to the deed, there was no fraud in fact. It must be remembered that the statute uses the language "with intent to hinder, delay, or defraud," and the intent to do either is sufficient, and that intent is gathered from the act and the effect of it. If the effect of the act done be either to hinder, delay, or defraud, the law will conclusively infer the intent, though in fact it may not have existed. To defraud within the meaning of the law is not necessarily to swindle and cheat, getting an undue advantage by immoral or dishonorable means, but any deprivation of another's legal right by securing to one's self a benefit, is a fraud. That the debtors' real motives and intentions have nothing to do with the property rights of parties, see abundant authority and reason in *Burrill on Assignments*, 503, etc., 523; *Lippincott v. Barker*, 2 Binney 174, 4 Am. Dec. 433 (Pa. 1809); *Turnipseed v. Schaefer*, 76 Ga. 107, 2 Am. St. Rep. 17 (1886); *Duggan v. Bliss*, 4 Colo. 223, 34 Am. Rep. 80 (1878); *Barnitz v. Rice*, 13 Md. 24, 74 Am. Dec. 513 (1859); *Wait on Fraudulent Conveyances*, chapter 14, and §§ 8-9, 196-7.

The case of *Coleman v. Burr*, 93 N.Y. 17 (1883), is strongly in point, as there the fact of honest intention in the grantor was reported on by the referee, who found that the whole transaction was not only honest but fair, and should stand. The Court said, however, that although the referee "has characterized the transactions as honest and fair, that does not make them innocent nor change their essential character in the eye of the law. Mr. Burr [the debtor] must be deemed to have intended the natural and inevitable consequences of his acts, and that was to hinder, delay, and defraud his creditors." *Id.* at 31.

This subject was touched upon in that part of this opinion respecting notice to the trustee and creditors, and will not be further pursued. Suffice it to say, that if the arguments of defendant's counsel as to notice to the grantees and as to the good faith of the grantors were both to prevail, the result would be that where the trustee and creditors knew nothing of the omitted property, · no matter how valuable, the deed is valid, because of the lack of notice in them, and where the grantor had informed them of it, the deed is valid because of the lack of actual fraud in the grantor.

It remains to consider the effect of the omission from a deed like this of property of substantial value, whether the whole deed is void or only the provision requiring a release. If by the law of Virginia the requirement of releases were forbidden and declared void in any and all deeds, the question might arise whether such forbidden clause only was void, or the whole deed. In that case a court of equity might very well cut out the offending member and let the untainted part remain; but release clauses are not forbidden. They are not void. They are not like fictitious debts which are void everywhere as against creditors and may be stricken out wherever found. The release clause in a deed is as valid as the granting clause; it taints and infects the whole deed only when another fact exists, to wit the reservation to the debtor's use of valuable property liable for debt. The Court can no more strike out the release provision than it can put the reserved or omitted property into the conveyance. Either would cure the objection to the deed. There is no illegal provision in the deed. It comes within the denunciation of the statute on account of what is left out of it, as much or more than for what is in it. The Court cannot reform the deed and make a new contract for the parties. Besides this appearing to be the correct principle, the statute makes it plain by declaring that "every assignment of any estate given with intent to hinder, delay or defraud creditors of or from what they are lawfully entitled to, shall as to such creditors be void." § 2458, Code of Va. The *assignment* shall be void, not any part or so much of it as defrauds, etc.

Otherwise, what discouragement would there be against any illegality, if the only result of discovery were the annulling of the illegal part? The law would be like an anti-usury law, where the penalty of infraction is the forfeiture of the excess of interest beyond the legal rate.

In some of the Virginia cases cited, an unguarded expression has more than once fallen from some of the judges seeming to indicate that the release clause only in a deed conveying a part only of the debtor's property is void and not the whole deed. But there has been no decision to that effect, and such a result would be contrary to the statute. The two cases in which the expressions are found are *Skipwith v. Cunningham* and *Gordon v. Cannon,* in both

of which, there being no omitted property, the deeds were sustained. But the case of *Quarles v. Kerr*, 55 Va. (14 Gratt.) 48 (1857), is directly in point. There the Court found there was omitted property, and it set aside the whole deed, and this decision, rendered in 1857, has never been questioned. In that case, too, a second deed was made covering the omitted property, *before* the suit attacking the first deed was brought, yet the Court set aside the deed that was attacked. A great number of cases are enumerated in the brief of plaintiff's counsel where the entire deed was declared void and not merely the obnoxious provision. See *Perry v. Shenandoah Nat. Bank*, 68 Va. (27 Gratt.) 755 (1876); *McCormick, Trustee v. Atkinson*, 78 Va. 8 (1883); *Burton v. Mill*, 78 Va. 468 (1884); *Graves v. Roy*, 13 La. 454, 33 Am. Dec. 568, 1 Am. L. Cases 91-2 (1839); and Hare & Wallace's *Notes*, 99; *Burrill on Assignments*, § 352; Wait, *Fraudulent Conveyances*, § 434; 1 Am. and Eng. Enc. 869. There is no case in Virginia in conflict with these views. In *Gordon v. Cannon* there was no reformation of the deed, but the question was simply as to the proper administration of the trust fund. The deed conveyed partnership property and individual property to pay both partnership and individual debts without discrimination, and the Court simply marshalled the assets, and distributed the fund *consistently with the deed*; the same state of affairs [was] in *McCulloch v. Somerville*, 35 Va. (8 Leigh) 415 (1836).

Speaking to another point, Judge Moncure did say in that case that the deed ought to "give to the creditors all the information in the power of the debtor as to the nature and value of the property conveyed and the amount of the debts . . . provided for." *Gordon v. Cannon*, 59 Va. (18 Gratt.) 387, 402 (1868). The deed in question here gives no approximation of the value of the property conveyed nor any idea of the amount of debts secured. The total of the sums specified in the deed amounts to very little over $12,000, while the total as listed in the trustee's circular to the creditors amounts to over $37,000. And as it is not known how far the assets conveyed will reach, the Court is unable to state what percentage the property omitted would pay on the debts to which it is applicable, but as already seen it is undoubtedly of substantial value, and its omission invalidates the deed.

It has been impracticable in this review to comment on or quote from all the authorities in point, but no Virginia decision has been found in conflict with any legal principles by which the Court has been led to its conclusion. Nor has it been deemed necessary to trace the decisions from *Twyne's Case*, 3 Coke Rep. 806, 76 Eng. Rep. 809 (Star Cham. 1601), decided over two hundred years ago, nor the history of the statute from its English original enacted in the time of Queen Elizabeth. The statute is remedial and should not

be whittled away by judicial construction, and this Court will not advance one step in that direction beyond the precedents by which it is bound.

Where the facts are plainly proven and the principles which control them sound and well established, the result in any given case ought not to concern the Court; yet it may be as well to remark that the assets of this firm will be as justly and equitably applied under the rules of the Court as under the deed, if not more so. In their deed the debtors prescribed an order of payment and required those who were to receive less to release the most. The law, on setting aside the deed, gives priority to those who bore the heat and burden of the contest and requires releases of none. If the assets prove insufficient to pay all creditors in full, it is no more than would have resulted under the deed and is a misfortune common among men and unavoidable alike by the ordinances of human laws or the skill of human hands.